**MOUNT SINAI HOSPITAL OF GREATER MIAMI, INC.,** Plaintiff-Appellee,

v.

Caspar **WEINBERGER,** Secretary of Health, Education and Welfare, and Blue Cross of Florida, Inc., Defendants-Appellants.

No. 74–2154.

United States Court of Appeals, Fifth Circuit.

Aug. 8, 1975.

Rehearing and Rehearing En Banc Denied Nov. 3, 1975.
See 522 F.2d 179.

Robert W. Rust, U. S. Atty., Robert N. Reynolds, Asst. U. S. Atty., Miami, Fla., David Cohen, App. Section, Civ. Div., Dept. of Justice, Washington, D. C., for defendants-appellants.

Kelly, Black, Black & Kenny, P. A., Miami, Fla., for Blue Cross.

James G. Roth, Miami, Fla., Burton A. Schwalb, Washington, D. C., Lewis I. Horwitz, Miami Beach, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, and GODBOLD and CLARK, Circuit Judges.

GODBOLD, Circuit Judge:

This case arises from an attempt by the Department of Health, Education and Welfare [HEW] to recoup $6.3 million from Mount Sinai Medical Center ["the hospital"]. This amount was allegedly paid to Mount Sinai for medically unnecessary services and hospital stays provided to beneficiaries under the Medicare hospital insurance system from 1966 to 1971. Before HEW could commence recoupment by putting into effect a partial freeze on future payments to Mount Sinai to offset the amount claimed, the hospital sued for temporary and permanent injunctive relief against the freeze.

HEW's attempt to recoup the funds was based on its theory that the government has a common law right to recoup monies paid out illegally. The District Court granted temporary relief. Later, after hearing and on cross motions for summary judgment, it accepted Mount Sinai's principal defense that the complex statutory and administrative scheme governing the Medicare program had abrogated the government's right to recoup, and it granted a permanent injunction. 376 F.Supp. 1099 (S.D.Fla., 1974). HEW appeals. We reverse on the recoupment issue and remand for further proceedings.[1]

Mount Sinai is a major provider of services under the Medicare program, the largest in the southeast and, measured in terms of cost of services, more than twice as large as the second largest provider in its state. From 60 to 70 percent of Mount Sinai's patient-days and total billings are now attributable to Medicare.

Allegations of wrongdoing by Mount Sinai in operation of the Medicare program were made in 1972. HEW subjected to review by a peer review committee of doctors a sample consisting of the charts of 710 patients from a single year. The statistical results of the committee's determinations of medically unnecessary hospital stays and ancillary services drawn from this sample were then applied to all years in question, producing a calculated, as opposed to actual, overpayment figure of $6.3 million.

[1.] The parties have briefed and argued two substantial issues other than the recoupment question: whether HEW followed properly promulgated regulations in attempting to institute the freeze, and whether in any event the procedures utilized comported with Mount Sinai's Fifth Amendment due process rights. We do not reach these issues, which are for the District Court to rule on in the first instance.

## I. The Medicare system

Federal Health Insurance for the Aged, popularly known as Medicare, was enacted by Congress in Title I of the Social Security Amendments of 1965, P.L. 89–97, §§ 101–122, 79 Stat. 286, July 30, 1965, as Subchapter XVIII of the Social Security Act, codified as 42 U.S.C. §§ 1395–1395ll (1970), as amended 42 U.S.C. §§ 1395–1395pp (Supp.III).[2] The system contains two substantively distinct parts, one providing insurance for hospital and related post-hospital services, known as Part A, 42 U.S.C. §§ 1395c–1395i–2 (Supp.III), the other providing insurance for supplementary medical services, primarily physicians' services, known as Part B, 42 U.S.C. §§ 1395j–1395w (Supp.III). This case concerns Part A.[3]

Under Part A, the hospital insurance program, persons aged 65 and older, § 1395c,[4] receive essential hospital services, § 1395d, paid for from a trust fund financed by wage taxes on employees and self-employers, 26 U.S.C. §§ 1401(b), 3101(b) and 3111(b) (1970), the Federal Hospital Insurance Trust Fund, § 1395i. The hospital services are paid for directly by the government. However, only those hospitals and other institutions that qualify as "providers of services" under § 1395x(u),[5] incorporating § 1395x(e), (j), and (o), and that are accredited under § 1395bb, are eligible to receive payments under the program, § 1395f(a). They can do so only after entering into agreements with the Secretary of HEW meeting the requirements of § 1395cc(a), § 1395f(a). They must agree, among other things, not to charge a Medicare beneficiary for any services received under the program, § 1395cc(a)(1)(A), other than for co-insurance and deductibles provided for in § 1395cc(a)(2)(A), but instead to look only to the government for compensation. Payment for services is based on the reasonable cost of such services, § 1395f(b), as determined pursuant to § 1395x(v) and the appropriate regulations, 20 C.F.R. § 405.401 et seq.

Day-by-day administration of the Medicare program is handled by "fiscal intermediaries." These are private, nongovernment entities, frequently health and accident insurance companies (including "Blue Cross" organizations) nominated by a provider or group of providers. They enter into contracts with HEW and serve as HEW's agent for many functions, such as hospital audits, information dissemination, and fund disbursement, § 1395h. Defendant Blue Cross of Florida, Inc., is the fiscal intermediary between Mount Sinai and HEW and also agent for HEW. Defendants Blue Cross and the Secretary of HEW will be referred to collectively as "HEW."

Providing services to a beneficiary raises two important and distinct issues: (1) whether the services provided are covered by § 1395d and not excluded by § 1395y; and (2) whether the amount paid for the services is the "reasonable cost" under § 1395x(v).[6] Each issue is resolved under distinct procedures. In resolving the question before us we must consider the bearing of these separate procedures on a recoupment section that makes no distinction between cost questions and coverage questions.

---

2. And miscellaneous other sections of Title 42 not pertinent here.

3. Part B is the subject of a companion case, Szekely v. Florida Medical Association (Weinberger), also decided today, see 517 F.2d 345, 347. Part C, 42 U.S.C. §§ 1395x–1395pp (Supp.III), containing general provisions applicable to both Parts A and B, is at issue in both cases.

4. All references to sections mean sections of Title 42 of the U.S.Code, 1970 edition, or any supplement thereto, unless indicated otherwise.

5. The provision cited also refers to extended care facilities (changed to skilled nursing facilities by the 1972 amendments) and home health agencies.

6. A third question, eligibility of the beneficiary under §§ 1395c and 1395d, is procedurally indistinguishable from the coverage determinations under §§ 1395y and 1395d, 1395ff(b)(1)(C).

### A. Coverage determinations

The issues in coverage determinations are defined by §§ 1395d and 1395y. Section 1395d defines the benefits covered by Medicare: in-patient hospital services, post-hospital extended care services and post-hospital home health services with annual day or visit limits for each, § 1395d(a)(1)–(3). Section 1395y defines exclusions from the general definition of scope of benefits in § 1395d. The most important as a practical matter are the exclusions from coverage of services "which are not reasonable and necessary for the diagnosis or treatment of illness or injury . . .," § 1395y(a)(1), or which are for "custodial care," § 1395y(a)(9). The instant case involves services found by HEW not to be covered because not medically necessary under § 1395y(a)(1).

The parties primarily concerned with coverage determinations are HEW and the beneficiary. In theory the provider's interest is slight because the coverage determination merely has the effect of resolving who shall pay it for the services, Medicare or the individual. The administrative procedures for making the coverage determination reflect these theoretical interests, for only the beneficiary has a right to hearing and judicial review under the statute, §§ 1395ff(b)(1)(C) and (b)(2), and the regulations, 20 C.F.R. §§ 405.701 et seq., see particularly §§ 405.702, –.710, –.720, –.730 and –.750.[7] As a practical matter, however, the provider is greatly concerned about who its debtor is. The alternative debtors are the government and a private individual who may be hard to find, harder to collect from, and impossible to placate if collection from him is necessary.

### B. Cost determinations

█ The issues in cost determinations are defined by § 1395x(v) and the regulations pursuant thereto, 20 C.F.R. § 405.401 et seq. The rules for what constitutes reasonable cost have a substantial impact on when and how the reasonable cost determinations can be made. The general rule is that Medicare will cover all costs of covered individuals, and no costs of individuals not covered, 20 C.F.R. §§ 405.454(a)(1) and (b)(1). The costs of a hospital department or service allocable to Medicare beneficiaries is based on the proportion of charges made with respect to Medicare beneficiaries to all charges for hospital services, 20 C.F.R. §§ 405.452(a), (b) and (e)(1). This computation of the proportion of charges can be made only at the end of some fiscal period. Thus, the final determination of the reasonable costs for any given service can be finally determined only at the end of the fiscal year during which the service was supplied. HEW is required to make periodic interim payments in the meantime, not less frequently than monthly, § 1395g, to meet hospitals' liquidity needs, 20 C.F.R. § 405.402(b)(1). These payments are approximations of what HEW and the hospital expect will be properly chargeable to Medicare. The fiscal intermediary audits the accounts of each hospital on an annual basis to determine how much the hospital should have been paid. Subsequent payments for the following year's services are adjusted to compensate for prior payments that were above or below the amounts actually owed, § 1395g and 20 C.F.R. §§ 405.451(b)(1) and 405.454(a) and (f).

Section 1395g is limited in its impact to cost redeterminations and does not touch coverage problems. Despite its general references to "overpayments," similar to § 1395gg(b), consideration of the Medicare Act as a whole shows that this section has much more limited scope than is contended for by the government. The District Court's opinion on this question correctly analyzes the statutory scheme. 376 F.Supp. at 1127–1129. Congress chose to pay providers only the "reasonable cost" of services, to be determined at the end of each fiscal year.

---

7. The 1972 amendments give the provider standing and a right to judicial review in coverage determinations. *See* footnote 22, *infra*.

Lump sum annual payments made long after services were rendered would be inadequate in light of hospitals' liquidity needs, so Congress authorized interim estimated payments to providers to be paid at least monthly with subsequent adjustments for overpayments and underpayments. Thus, some adjustment for overpayments and underpayments was necessitated by the "reasonable cost" payment system provided in §§ 1395f(b) and 1395x(v), and specifically by the proviso for "suitable corrective retroactive adjustments," § 1395x(v)(1)(A)(ii). This is exactly the function of the adjustments authorized in § 1395g. The contents of §§ 1395g and 1395x(v)(1)(A)(ii) track each other so closely that there would seem to be no other conclusion than that Congress intended that § 1395g relate only to cost determinations.

■ The parties primarily concerned with cost determinations are HEW and the provider. The beneficiary has no interest in them because the provider has already agreed to look only to HEW for compensation for services provided, § 1395cc(a)(1)(A).[8] The statute does not provide for any type of administrative hearing or judicial review for the provider itself, § 1395g, cf., § 1395ff. And at the time the dispute leading to this litigation occurred no regulation provided any right to hearing or review. The regulation utilized by HEW and relied on by HEW in this litigation was promulgated pursuant to § 1395g. It authorizes HEW to suspend payments to a provider in whole or part when HEW determines that the provider has been overpaid, 20 C.F.R. § 405.370(a)(1), or has reliable information to that effect, 20 C.F.R. § 405.370(a)(2). This section provides for no "hearing" properly so called beyond a right to a statement from HEW of the reasons for the suspension and a privilege to submit information to show that the suspension should not be put into effect, 20 C.F.R. § 405.371(a), or would cause irreparable harm, 20 C.F.R. § 405.373(a). At least one district court has held the provider has a constitutional right to a hearing and judicial review on adverse reasonable cost determinations. *Coral Gables Convalescent Home, Inc. v. Richardson*, 340 F.Supp. 646 (S.D.Fla., 1972). HEW has issued regulations for such cost redetermination hearings, 20 C.F.R. §§ 405.490–405.499i (1973), now § 405.1801 *et seq.*

### C. The adjustment and recoupment provision

■ The final element in the statutory scheme is § 1395gg, which authorizes HEW to recoup some overpayments from beneficiaries' old-age benefits, but only where "the excess over the correct amount cannot be recouped from [the] provider." The section does not by itself authorize recoupment from providers, but it establishes the failure to recoup from providers as a precondition to recoupment from beneficiaries, which it does explicitly authorize.[9] It thus assumes that there is some kind of right in HEW to recoup overpayments from providers, but it gives little hint as to the basis or scope of this right. It is not seriously disputed that this reference to recoupment means the common law recoupment for which the government contends in this case. But the question to be resolved is whether the scope of this common law right has been affected by the pervasive and complex statutory scheme present in the Medicare hospital insurance system.

---

8. The beneficiary cannot be held liable where a provider has been paid more than its reasonable cost for services rendered to the beneficiary because the beneficiary cannot be at fault for the results of a proceeding in which he played no part, direct or otherwise, § 1395gg(c). *See* Part III. A, *infra.*

9. Congress added a second precondition in the 1972 amendments to the Medicare Act: the provider must also be "without fault" before HEW can proceed against the beneficiary, § 1395gg(b)(1)(B). In effect, this means that recoupment cannot be had from the provider where it was without fault. This was Congress' intent. *See* footnote 26, *infra.*

## II. The government's common law right to recoup

 The trial court held that the government's common law right to recoup would be available but for the statute present in this case. 376 F.Supp. at 1126. We agree. In some circumstances when government funds are improperly paid out the government has a claim enforceable either by direct suit [10] or by setoff against money owed by the government to the recipient of the illegally dispensed funds.[11] The difficult question is what kinds of illegal or improper disbursements create this cause of action. Where the relevant statute did not authorize such payment, *United States v. Wurts, supra,* footnote 10, *Hilburn v. Butz, supra,* footnote 11, or specifically prohibited it, *United States v. Barlow, supra,* footnote 10, the United States has a cause of action to recover the money thus erroneously paid, and "no statute is necessary to authorize the United States to sue in such a case," *United States v. Bank of Metropolis,* 40 U.S. at 401, 10 L.Ed. at 783. Similarly, where the payments would be authorized but for erroneous understandings of fact, the government may recover, even where its own employees and agents were partly responsible for failing to discover the correct facts, *United States v. Barlow, supra,* footnote 10, but not where they were guilty of a "mere error of judgment," 132 U.S. at 280, 10 S.Ct. at 79, 33 L.Ed. at 351.[12]

 Here, the statute specifically prohibits any payments for services that are medically unnecessary, § 1395y(a)(1). This prohibition is part of the statute creating the administrative system under which all payments are authorized; it implicitly limits the authority of HEW officials to make payments under Medicare. This is exactly the kind of limitation which under federal common law creates both a legal claim in the government and a remedy by way of setoff, as was attempted to be exercised by HEW in this instance.[13] Moreover, the government has asserted that its agents did not exercise their judgment on the precise question of medical necessity but acted on erroneous understandings of the facts presented to them in the certificates executed by the provider and doctors under § 1395f(a) and § 1395f(a)(3) in particular. See *United States v. Barlow, supra,* footnote 10, and compare *Dana Corp. v. United States,* 470 F.2d 1032 (Ct.Cl., 1972).

 In finding the government's common law recoupment right applicable but for the statutory scheme present here the trial court drew no distinction between gratuitous payments made to beneficiaries and payments to contractors or others where some legal consideration might have passed. This is in accord with the case law. The issue is not the nature of the relationship or the position of the recipient but whether the money was illegally or erroneously paid. The government has previously prevailed in recouping funds paid to government contractors and others who were not gratuitous beneficiaries. *United States v. Bank of Metropolis, supra,* footnote 11. *Wilson Clinic & Hosp., Inc. v. Blue Cross of So. Carolina,* 494 F.2d 50, 52 (CA4, 1974); *United States v. Mead,* 426 F.2d 118, 124 (CA9, 1970); *Dana Corp. v. United States, supra; cf., Weiss v. Unit-*

---

**10.** United States v. Wurts, 303 U.S. 414, 415, 58 S.Ct. 637, 638, 82 L.Ed. 932, 934 (1938); United States v. Barlow, 132 U.S. 271, 279–280, 281–282, 10 S.Ct. 77, 79–80, 33 L.Ed. 346, 351–352 (1889); Weiss v. United States, 296 F.2d 648 (CA 5, 1961).

**11.** United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); Hilburn v. Butz, 463 F.2d 1207 (CA 5, 1972); *see also* United States v. Bank of Metropolis, 40 U.S. (15 Pet.) 377, 400–401, 10 L.Ed. 774, 783 (1841), in which defendant in an assumpsit action by the United States was denied a setoff where the claimed credit on which it was based was not authorized.

**12.** Although the Court there makes reference to a statute authorizing suit, quoted in 132 U.S. at 277, 10 S.Ct. at 79, 33 L.Ed. at 350, the distinction drawn between errors of judgment and mistakes of fact is not derived from the words of the statute.

**13.** *Cf.,* United States v. Associated Transport, 505 F.2d 366 (CADC, 1974).

ed *States, supra,* footnote 10, *Hilburn v. Butz, supra,* footnote 11.

■ Moreover Mount Sinai is not a neutral, innocent third party in this three-way transaction between HEW, Medicare beneficiary, and Medicare provider. The decision to provide a service is made by the individual attending physician, who is far better informed on both the medical issue and the scope of Medicare coverage than is the patient-beneficiary. The physician is either an employee of the hospital or a doctor with staff privileges. Whatever else the granting of staff privileges may connote, it is clear to us that it involves a delegation by the hospital of authority to make decisions on utilization of its facilities. Certainly in the case of Mount Sinai, where the majority of patients and patient-days are under Medicare insurance, this must also include a delegation of authority to permit the use of its facilities for Medicare-financed patients.

■ It is suggested by Mount Sinai that recoupment should not apply where it has not received a "windfall." The hospital did not receive money without giving something in return. No one questions that services were provided at reasonable cost for all the payments actually received. But the unfairness in not paying for services that were provided has nothing to do with recoupment. Indeed, this provision of services without payment by Medicare is exactly what happens no matter when HEW decides a service is not covered. Mount Sinai does not challenge the authority of the government to make its decision not to pay for a service after the performance of the service. The only distinctions between not making payment in response to an original claim, which Mount Sinai concedes is proper, and seeking to recoup payment after it has been made, which the hospital challenges, are the making of ' the preliminary decision to pay and the subsequent passage of time. Whether payment is denied or payment is made and recoupment asserted, the hospital

has already provided the services and suffers the same loss of compensation from the Medicare program for services rendered. In both situations, it must then turn to the patient for payment. The delay incident to the use of recoupment may cause greater difficulty in proving that the services given were medically necessary and in collecting from the patient. But we do not consider these factors to have any bearing on the government's right to recoup.

### III. Effect of the statute on the right to recoup

■ The trial court held that the right to recoup was abrogated in this case by the comprehensive "all-encompassing" administrative system embodied in the Medicare Act and its amendments, 376 F.Supp. at 1127. The court found congressional intent to abrogate "manifested by the totality of the statutory scheme," *id.,* at 1130. We think that Congress' intent when it enacted the Medicare Act in 1965 was not to limit the common law right. Provisions not referred to by the trial court [14] show that Congress' understanding in 1972 when it amended the law was that the common law right was intact and was expected to be utilized. The recoupment right does not always fit consistently and logically into the statutory system, but the alternative of no right to recoup produces even more severe incongruities. Provisions apparently contrary to the government's right to recoup serve important functions that complement rather than displace or supersede the recoupment right. Where a difficult but not dispositive conflict appears between statute and common law, Congress has already acted in the 1972 amendments to reconcile the statute to the recoupment right.

### A. Congressional intent—the original act

■ Section 1395gg justifies recovery of overpayments paid to providers from

---

**14.** And presumably not called to its attention since not cited to us by either of the parties

until post-oral argument memoranda were filed at our request.

the beneficiaries who received the services paid for by saying that any payment to a provider "shall be regarded as a payment to" the beneficiary who received the services for which the payment was made, § 1395gg(a). It then authorizes HEW to deduct the amount owed from the beneficiary's old-age benefits under Title II of the Social Security Act, *but only when "the excess over the correct amount cannot be recouped from [the] provider . . .,"* § 1395gg(b)(1) (emphasis added).[15] On its face, this reference to recoupment from providers would appear to be dispositive. It shows that Congress expected and intended HEW to recoup improper payments to providers without limitation as to the reason for the overpayment, and authorized deductions from beneficiaries' old-age benefits only as a last resort after recoupment had failed. However, we must go deeper than the face of the provision.

■ The alternative remedies of recoupment and adjustment posit an area of common liability where both provider and beneficiary are alternatively responsible to the trust fund for the same overpayment. Providers can be held liable for reasonable cost overpayments, and beneficiaries can be held liable for coverage overpayments. But to have common liability either providers must be subject to liability for coverage overpayments or beneficiaries must be subject to liability for reasonable cost overpayments.[16]

■ Elsewhere the act sets up different procedures for determinations respecting cost and those respecting coverage. Providers take no part in coverage hearings and beneficiaries have nothing to do with cost determinations. Mount Sinai puts great emphasis on this procedural system and suggests that it is out of keeping with this bifurcated scheme to subject it to recoupment of funds overpaid with respect to coverage. This argument has little force because the common liability posited by the section must exist inconsistently with the procedural structure either for providers or for beneficiaries or for both, and the same argument made by Mount Sinai is available to a beneficiary.

■ A difficulty with subjecting providers to liability for non-covered services is that the provider then has an action over against the beneficiary under state law. As between HEW and the beneficiary, HEW could not collect directly from the beneficiary because it has already made a determination of coverage under § 1395ff(b) to which HEW and the beneficiary were the only parties. Thus the beneficiary may become liable to the provider for the services received, even though in the only prior contact with the Medicare program, the coverage determination under § 1395ff(b), the decision made was that Medicare would pay for the service and the patient was not liable.[17][18]

---

**15.** This language now appears as § 1395gg(b)(1)(A). A 1972 amendment added a second precondition to deduction from a beneficiary's old-age benefits: the provider must also be without fault for the overpayment, § 1395gg(b)(1)(B). *See* footnote 26, *infra.*

**16.** Or both could be liable for coverage overpayments and both liable for cost overpayments. For reasons appearing below, we think not.

**17.** This anomaly is rendered more severe because of the differing parties in the various determination procedures and the different procedural rights given each. The beneficiary has a statutory right to a hearing and, where the dispute rises above certain dollar minimums, a statutory right to judicial review,

§ 1395ff(b)(2). These rights are elaborated on in HEW regulations, 20 C.F.R. § 405.701 *et seq.* But the provider, against whom HEW may proceed after its rights against the beneficiary have long lapsed, has no such protections. The hearing which the provider receives consists of a right to submit evidence on the issues of propriety of suspension and irreparable harm and the right to be apprised of the reasons for the suspension. See Part I. B, *supra.* Thus the administrative system's different procedures increase the probability of inconsistent results between different parties.

**18.** Mount Sinai also suggests that subjecting it to coverage recoupment is unfair because of the limitation of § 1395cc(a)(1)(A) that providers agree not to charge beneficiaries for any covered services. This provision merely re-

A difficulty with subjecting beneficiaries to liability for payments in excess of reasonable cost is that the beneficiary is truly an innocent third party. He not only did not take part in the original reasonable cost determination, but he can neither gain nor lose by the outcome and can have no responsibility for errors. No matter what the outcome of this determination, the beneficiary can suffer no additional liability. He has no knowledge of the determination and no real interest in the matter. Thus, the failure of Congress to have beneficiaries take part in reasonable cost determinations reflects beneficiaries' bona fide interests. In light of the unfairness in subjecting beneficiaries to this liability we do not think Congress intended such a result.[19]

To explain the common liability posited by § 1395gg while excluding provider liability for coverage overpayments, Mount Sinai contends that beneficiaries are subject to liability for reasonable cost overpayments. This result it supposes is authorized by the basic premise of § 1395gg contained in § 1395gg(a), the subsection which says payments to providers are to be regarded as payments to the beneficiaries who received the services. Mount Sinai argues that Congress was simply recognizing beneficiaries as the ultimate recipients of the funds and placing on them the ultimate responsibility for incorrect payments.

We think Congress had something else in mind in enacting § 1395gg, and § 1395gg(a) in particular. No recovery against the individual beneficiary—who received only medical services, not payments from the trust fund—would ever be proper without some statutory authorization. That is the limited function of § 1395gg(a). Congress could not authorize reductions of old-age benefits without some reason, and the reason statutorily supplied is that Medicare payments are to be considered payments actually made to the beneficiary.

Thus, § 1395gg taken as a whole does not provide for primary responsibility of the beneficiary with narrow provider responsibility for payments in excess of reasonable cost. Rather, it posits general provider responsibility based on the fact that providers receive the funds, but permits a narrow category of recovery from beneficiaries, i. e., when the provider is not available and the beneficiary was at fault for the erroneous payment.

Other parts of § 1395gg suggest that Congress never intended beneficiaries to be held liable for administrative errors in cost determinations, errors which they had no part of, could not have contributed to if they wanted to, and in which they had no interest. Section 1395gg(c) prohibits recovery from the beneficiary by adjustment of old-age benefits where the beneficiary was without fault. A beneficiary cannot be at fault for erroneous cost determinations since he plays no role at all in the proceedings. In light of this limitation of

---

quires the provider to choose between charging the Medicare trust fund or charging the beneficiary for the service provided, depending on whether the service was covered or not. It does not prohibit the provider from charging the beneficiary for a non-covered service nor does it expose the provider to the sanctions of § 1395cc(b)(2)(A) for charging beneficiaries for covered services, so long as the provider thought the service was not covered and did not attempt to collect from Medicare for it. Mount Sinai may be concerned about the prospect of doctors deciding in favor of coverage only to be contradicted by the hospital's review or claims unit. The Act does not distinguish between doctors and providers in that way; they are viewed as a single entity. Once

they have resolved their differences they can act, and they can charge whoever should be liable, Medicare if the service was covered, the beneficiary if it was not covered.

19. By contrast, providers are not strangers to the coverage determination. It is the provider who makes a decision on coverage in the first instance and certifies to the medical necessity of the services provided. And who will be the provider's debtor liable for the services rendered will be determined in the coverage hearing. Thus, providers have both knowledge of and an interest in the hearing, and subjecting them to liability for coverage errors not only does not offend notions of fairness, but may be both fair and reasonable.

§ 1395gg(c), we conclude that § 1395gg(b) was not intended to authorize recovery of overpayments based on erroneous reasonable cost determinations.

■ This leaves only responsibility for coverage errors as the common liability of provider and beneficiary. Thus coverage errors comprise the entire scope of operation of § 1395gg(b). The proviso in § 1395gg(b)(1)(A) requiring an attempt to recoup from the provider as a precondition to adjustment thus must contemplate provider liability for such overpayments.[20]

■ There is a possibility of inconsistent results in the different coverage determinations made between HEW and the beneficiary before payment and between HEW and the provider after payment, but this possibility is consonant with both the Medicare Act and general recoupment law. Standing alone, it does not show that Congress intended abrogation of recoupment. Congress was parsimonious in granting rights to providers in the original act. For example, where the provider's claim to a right to a hearing and judicial review was stronger— following adverse reasonable cost determinations under § 1395ff(b)(1)—Congress was silent and gave no statutory hearing or review.[21] Moreover, as to intent, Congress' response on learning of this difficulty was not to eliminate recoupment but to give providers standing in the administrative determination of coverage questions and the right to judicial review, § 1395pp, added in 1972.[22] Nor does the possibility of inconsistent results require a holding of abrogation of common law recoupment on the basis that it is incompatible with the statutory system. The ultimate result of inconsistent decisions is that the provider must bear the loss. The fact that but for the earlier proceeding the provider might have been able to recover over from a third party, the beneficiary, puts the provider in no worse situation than other recipients of improperly disbursed government funds. See the discussion of the recoupment right generally, Part II, *supra*.

### B. Congressional intent—the 1972 amendments

Nothing in the original act explicitly referred to recoupment from providers of payments made for non-covered services. The 1972 amendments filled the gap. Four related amendments refine the defenses to recoupment for both beneficiary and provider and establish that recoupment from the provider for payments for non-covered services is assumed.[23]

---

**20.** This is not to say that recoupment is limited to overpayments due to coverage errors, but merely that it must include coverage errors.

**21.** 'A district court has held that there is a constitutional right to a hearing and judicial review from such adverse cost redeterminations. Coral Gables Convalescent Home, Inc. v. Richardson, 340 F.Supp. 646 (S.D.Fla., 1972).

**22.** The principal function of the new section is to authorize payments where neither provider nor beneficiary knew or should have known that a service was not medically necessary, § 1395pp(a), a modification of the exclusion in § 1395y(a)(1). The hearing for providers as well as beneficiaries is provided for in § 1395pp(d). Although not specified in terms, the most reasonable construction would be that where § 1395pp(a) authorizes payment (*i. e.*, the provider should not have known that the service was medically unnecessary), then § 1395gg(b) does not authorize recoupment (the provider was "without fault"). Conversely, where § 1395pp(a) does not authorize payment (i. e., the provider should have known the service was medically unnecessary), then § 1395gg(b) does authorize recoupment (the provider was not "without fault"). Thus, authorization and recoupment interlock neatly and the hearing on authorization deals with the issues involved in recoupment. The § 1395pp(d) hearing may be held whenever authorization of payments is questioned, and that may occur either before or after payment, *viz.*, in a recoupment proceeding.

**23.** The amendments are all contained in § 281 of the Social Security Amendments of 1972, Act of Oct. 30, 1972, P.L. 92–603, 86 Stat. 1454. Three of the amendments are discussed here. The fourth concerns Part B and is discussed in *Szekely, supra.*

In reporting these amendments, the Senate Finance Committee told Congress:

Under present law, the Secretary [of HEW] is required to recover overpayments made to or on behalf of an individual where it is determined that [the] services . . . were not covered under [M]edicare. Further, present law provides that overpayments made to providers or other persons for services furnished . . . which cannot be recovered from the overpaid provider[24] . . . may be recovered [by adjustment of the individual beneficiary's old-age benefits].

S.Rept. 92–1230, 92d Cong., 2d Sess., pp. 313–314 (1972).

 The Senate committee assumed that providers could be held liable for payments for non-covered services. Acting on that assumption, it proceeded to recommend (and Congress subsequently enacted) refinements in §§ 1395gg(b) and (c). The refinement to HEW's right to make adjustments to a beneficiary's old-age benefits to recover overpayments is in effect a three-year statute of limitation.[25] The refinement to HEW's right to recoup from providers makes non-fault a defense and sets up a presumption of non-fault three years after payment is made.[26]

 Congress saw another problem: a provider required to make repayments might still attempt to collect from the beneficiary even though HEW itself was barred from doing so by the amendment to § 1395gg(c). The Senate report said:

The amendment also requires that providers under their participation agreements (or physicians or other persons where they have accepted assignments) where collection of an overpayment is made from the provider or others, be prohibited, after 3 years, from charging beneficiaries for services found by the Secretary to be medically unnecessary or custodial in nature, in the absence of fault on the part of the individual who received the services.

S.Rept. 92–1230, 92d Cong., 2d Sess., p. 314 (1972). This amendment appears as

---

24. Strict reliance on the punctuation in the original Senate report of the phrase beginning "which cannot . . ." may lead to an interpretation contrary to that suggested by a reading of this portion of the legislative history as a whole. The ease with which errors of punctuation can be made and overlooked makes us feel far more comfortable following the sense of the legislative history generally.

25. Prior to 1972, adjustment of a beneficiary's old-age benefits to recover improper Medicare payments was permitted where the beneficiary was at fault and where such recovery by adjustment was "not against equity and good conscience," § 1395gg(c). The 1972 amendment established the rule that adjustment was against equity and good conscience if the redetermination that services were not covered is made more than three years after payment, § 1395gg(c) [last sentence].

26. Prior to 1972 it was not a valid defense to recoupment that a provider was not at fault for the overpayment. The amendment made absence of fault a defense, § 1395gg(b)(1)(B), and added the rebuttable presumption that the provider was not at fault where the redetermination was made more than three years after

the original payment, § 1395gg(b) [last sentence].

Read narrowly, this change only says that a finding of the provider's non-fault is a precondition to adjustment of the beneficiary's old-age benefits to recoup the erroneous payment. Thus, it means that where the provider was at fault such adjustment is not permitted; where the provider was not at fault, adjustment is authorized. But adjustment is not required and recoupment is not prohibited. Conceivably, HEW might still have recoupment against the provider available as an alternate remedy. In light of the other restrictions on these old-age benefit adjustments, e. g., § 1395gg(c), such an alternative would be reasonable. But the legislative history suggests otherwise. Congress added § 1395gg(b)(1)(B) to give providers protection similar to that for beneficiaries in § 1395gg(c) that "recovery . . . will not be made with respect to an individual who is without fault . . ." S.Rept. 92–1230, 92d Cong., 2d Sess., p. 314. Congress also added the last sentence to § 1395gg(b) giving providers presumption of non fault after three years, analogous (but not identical) to the last sentence added to § 1395gg(c) giving beneficiaries an irrebutable rule of immunity.

§ 1395cc(a)(1)(B).[27] By reason of this amendment providers are prohibited from charging patients for services not covered by Medicare where the determination of non-coverage is made more than three years after the original payment. This kind of protection would not be necessary unless (1) providers could be required to reimburse HEW for money received in payment for non-covered services, and (2) the determination of non-coverage could be made after the original determination under §§ 1395ff(a) and (b), indeed, more than three years after that determination.

■ Subsequent statements of Congress about what it meant years earlier in enacting a law are "entitled to great weight in statutory construction." *Red Lion Broadcasting v. F.C.C.,* 395 U.S. 367, 380–381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371, 383 (1969). Here we have Congress at its most authoritative, adding complex and sophisticated amendments to an already complex and sophisticated act. Congress is not merely expressing an opinion on a matter which may come before a court but is acting on what it understands its own prior acts to mean. See *Red Lion, supra,* and cases cited in footnote 8, 395 U.S. at 380, 89 S.Ct. at 1801, 23 L.Ed.2d at 383. Moreover, certain of these new provisions explicitly refer to provider liability, whose existence is the question here litigated. To hold that HEW does not have the recoupment power attempted to be exercised against Mount Sinai and giving rise to this case would render these amendments pointless and ineffectual.

The situation before us is unlike those where Congress has attempted to direct subsequent court decisions on legislation whose original meaning was ambiguous, such as a committee of Congress attempting to advise the courts of what it thought a prior Congress meant, *Bobsee Corp. v. United States,* 411 F.2d 231, 237, footnote 18 (C.A.5, 1969); or Congress attempting to enact a clarifying amendment only to be rebuffed by the President who signed the original and thinks it has a different meaning, *Waterman S.S. Corp. v. United States,* 381 U.S. 252, 268–269, 85 S.Ct. 1389, 1398–1399, 14 L.Ed.2d 370, 379–380 (1963); or Congress failing to enact a clarifying amendment, from which ambiguous failure to act we are asked to draw some meaning, *United States v. Price,* 361 U.S. 304, 311–312, 80 S.Ct. 326, 330–331, 4 L.Ed.2d 334, 339–340 (1960); or legislative history vaguely referring to the prior state of the law, *United States v. Price,* 361 U.S. at 312–313, 80 S.Ct. at 331–332, 4 L.Ed.2d at 340.

■ Under these circumstances and in light of the construction we put on § 1395gg(b) as it existed prior to amendment, we think it clear that recoupment has always been available to HEW under facts like those of the instant case.

■ In an attempt to explain away these amendments, particularly § 1395cc(a)(1)(B), Mount Sinai insists that they are merely refinements or limitations on a new liability, purportedly contained in § 1320c–9(b)(3), rather than on the pre-existing recoupment right. This argument verges on the frivolous. Section 1320c–9(b)(3) is part of the new system of professional standards review organizations (PSRO). The PSRO system was adopted to deal with "abuse" of the Medicare system by providers and physicians.[28] The fine in § 1320c–9(b)(3)

---

27. And § 1395u(b)(3)(B)(ii), with regard to physicians taking assignments under Part B. See *Szekely, supra.*

28. A related provision prohibits any Medicare payments to a provider or physician excluded after hearing from taking part in Medicare, § 1395y(d). The parties rely on the legislative history of this provision to illustrate what Congress intended with § 1320c–9(b)(3). This section and its history distinguish, as does § 1320c–9(b)(3), between mere rendering of an unnecessary service and "abuse"—"overcharging, furnishing excessive, inferior, or harmful services, or making a false statement to obtain payment." See S.Rept. 92–1230, 92d Cong., 2d Sess., p. 200 (1972); H.Rept. 92–231, 92d Cong., 1st Sess. pp. 98–99 (1971), U.S.Code Cong. & Admin.News 1972, p. 4989. See also the testimony of Social Security Administrator Robert H. Ball in House Ways and Means Committee *Hearings on the President's Proposals for Welfare and Social Security Amendments,* 91st Cong., 2d Sess., p. 154 (1970).

344

is merely an alternative sanction to total exclusion from the Medicare program, § 1320c–9(b)(1). To read this fine as the recoupment referred to in §§ 1395cc(a)(1)(B) and 1395gg(b) and (c) would produce gaping incongruities. The fine is levied only against Medicare abusers who "demonstrated an unwillingness or a lack of ability substantially to comply with" the obligation not to provide unnecessary or harmful services under § 1320c–9(a)(1). Both of these grounds clearly envision some kind of fault. Yet § 1395gg(b)(1)(B) makes absence of fault a defense to recoupment. Moreover, to read this fine as the recoupment contemplated and limited by § 1395cc(a)(1)(B) suggests that providers could pass on to their patients this fine, levied only in lieu of expulsion from the Medicare program, if relevant determinations that services were not covered were made within three years of payment. This cannot be correct. The fine provided in § 1320c–9(b)(3) is a new liability, but it has nothing to do with the various limitations on liabilities in §§ 1395cc(a)(1)(B) and 1395gg(b) and (c), which were directed to the pre-existing right to recoup.

C. Other provisions and recoupment

1. Section 1395 provides, in part:

Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided . . .

The argument is made that subjecting hospitals to liability in recoupment for fees paid for unnecessary medical services would constitute interference with and supervision of the practice of medicine in violation of this section. Mount Sinai states that if HEW has the unlimited right to recoup contended for here that hospitals will of necessity "be constantly forced to second-guess the physicians on a virtually daily basis," that the "ominous ever presence of a wholesale recoupment power would create such a chilling effect . . . as to materially affect the ability and inclination of providers to act solely on the basis of the honest medical judgment of physicians" resulting, as a practical matter, in "interference with the practice of medicine."

 Elsewhere the act provides for an immediate claims review system, § 1395f(a)(1). A doctor or other provider of medical services decides whether the service is covered, and it either pays or does not pay, as it decides, §§ 1395f(a)(1), 1395ff(a) and 20 C.F.R. § 405.701 et seq. Thus HEW must decide in every case whether to pay for the services. The immediate review system was enacted by the same Congress that enacted § 1395. It is not seriously contended that the statutorily-mandated system for immediate review constitutes the kind of interference with and supervision of medical care prohibited by § 1395. Post-payment recoupment is not shown to be more onerous than the immediate review system. We conclude that recoupment is not proscribed by § 1395.

2. There are features of the original Medicare Act which relate to recovering improperly disbursed funds, but none does so in such a way as to suggest that Congress had considered the matter and decided not to utilize the common law recoupment right. Thus, § 1395y(b) requires that all payments under Medicare be conditioned on reimbursement when the services have been paid for by a

The lack of authority referred to in the committee reports, e. g., S.Rept. No. 92–1230 at p. 200, and by Commissioner Ball, was the lack of authority to withhold all future payments from particular providers who abused the program or endangered the lives of beneficiaries, that is, withholding amounting to total exclusion from the Medicare program. That is the authority HEW lacked prior to 1972 and that is the authority granted by Congress in §§ 1320c–9(b)(1) and 1395y(d). These references to a lack of authority to withhold future payments from such providers did not mean HEW could not withhold payments to offset any provider's liability to the program for prior or erroneous overpayments.

workmen's compensation plan. By contrast, the exclusions in § 1395y(a), *e. g.*, for medically unnecessary services and custodial care, are absolute. Payment is never permitted and there is no reference to subsequent reimbursement.

 The difference has no implications for recoupment. The purpose of provisional payment is to leave the account open to allow for subsequent contingent events which bear on liability. Congress could easily perceive that whether a certain medical service would be paid for under a workmen's compensation act would be unknown and perhaps could not even be reasonably surmised at the time the Medicare claim was made. It thus authorized provisional payment but then also authorized recovery if workmen's compensation did pay. The § 1395y(a) exclusions, by contrast, are not amenable to provisional payment. Whether certain treatment reasonably appears to be medically necessary at the time of the provider's decision does not depend on later contingencies. Nor did Congress want to shift liability to beneficiaries because reasonable judgments of medical necessity prove ultimately to be erroneous.[29] There was thus no reason to authorize provisional payments and their recovery.

In a like vein, the specific authority for after-the-fact adjustments for payments subsequently found to be erroneous under HEW's reasonable cost regulations does not suggest that other after-the-fact repayments or adjustments were not contemplated. The section authorizing such adjustments also authorizes interim estimated payments not less frequently than monthly, § 1395g. As the trial court noted, the authorization for adjustments for overpayments "simply recognizes and reconciles the conflicting demands of Section 1815 [§ 1395g] for

periodic settlement of the reasonable cost due when the necessary data becomes available, yet for sufficient frequency of payment to generate an adequate cash flow for the provider." 376 F.Supp. at 1129.

To summarize, we hold that the government's common law right to recoup is available to HEW in its implementation of the Medicare hospital insurance program to recover from providers funds paid for medically unnecessary services.[30] The other questions posed by the parties' briefs to this court we leave to the District Court on remand.[31] We remand for further proceedings not inconsistent with this opinion.

Reversed and remanded.

---

**29.** Of course, it may turn out that a certain treatment was not necessary because based on an erroneous diagnosis or for some other reason, but the proper test must be the reasonableness of the diagnosis and treatment at the time the diagnosis was made and the treatment decided upon.

**30.** The result may be harsh at times. Congress has chosen to deal with that harshness by its 1972 amendments, in particular the amendments of §§ 1395gg(b) and (c).

**31.** *See* footnote 1, *supra.*