**BEVERLY ENTERPRISES, Plaintiff,**

v.

**Honorable David MATHEWS, Secretary of the Department of Health, Education and Welfare, et al., Defendants.**

Civ. A. No. 76–1211.

United States District Court,
District of Columbia.

Dec. 16, 1976.

Thomas L. Patten and Allen B. Green of Sellers, Conner & Cuneo, Washington, D. C., for plaintiff.

Jordan A. Luke, Asst. U. S. Atty., Washington, D. C., for defendants.

MEMORANDUM

GASCH, District Judge.

This action for declaratory and injunctive relief arises under Title XVIII of the Social Security Act, commonly known as the "Medicare Act," 42 U.S.C. § 1395 *et seq.* Plaintiff is a California corporation which engages in, among other things, the business of owning and operating two nursing

home facilities, Beverly Manor Convalescent Hospital East and West (formerly known as Whitmar Nursing Complex East and West). It is a provider of health care services under the Medicare program and receives reimbursements accordingly. 42 U.S.C. § 1395g. Defendants are the Secretary of Health, Education and Welfare ("the Secretary") and Mutual of Omaha, a "fiscal intermediary" which presently serves as the Secretary's agent in connection with the disbursement of Medicare funds to plaintiff. *See* 42 U.S.C. § 1395h; 20 C.F.R. § 405.370.

Plaintiff brought this action on June 30, 1976, seeking to temporarily restrain the defendants from undertaking the suspension of the Medicare disbursements regularly made to plaintiff, a measure which the defendants had scheduled for implementation on that date as a means of "recouping" certain alleged Medicare overpayments made during 1967, 1968, and 1969. Plaintiff claimed that such recoupment would, *inter alia,* constitute an abuse of the Secretary's discretion and violate due process of law. At oral argument that day, the defendants agreed to reconsider their proposed course of action and to afford plaintiff 30 days' written notice if they once again decided to suspend plaintiff's Medi-

care disbursements. By letter dated November 10, 1976, the defendants indicated their intention to institute such a suspension as of December 10.[1]

On December 6, the Court heard oral argument on plaintiff's motion for preliminary and permanent injunctive relief.[2] At that hearing, defendants' counsel advised the Court of the Secretary's willingness voluntarily to afford plaintiff certain administrative remedies[3] to which plaintiff would not otherwise be entitled.[4] The Court finds, for the reasons set forth briefly below, that plaintiff's motion for a preliminary injunction should be granted and that defendants should be enjoined from suspending Medicare disbursements to plaintiff pending this Court's final determination of the merits of plaintiff's claim.

## FACTUAL BACKGROUND

In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* This legislation, popularly known as the "Medicare Act" ("the Act") and administered by the Secretary, provides federal funds for medical care received by aged or disabled persons. Under Part A of the Medicare program, the providers of appropriate medical services to proper Medicare beneficiaries are reimbursed by the federal

1. *See* Exhibit 1 to Plaintiff's Reply Memorandum. Subsequent to oral argument on December 6, defendants' counsel advised the Court that the defendants had decided to voluntarily refrain from undertaking to suspend plaintiff's regular Medicare disbursements pending the formal administrative appeal of plaintiff's liability designation which defendants have recently offered to plaintiff. *See* note 3 *infra.*

2. Although plaintiff has moved for permanent as well as preliminary injunctive relief and sought at oral argument to obtain a final decision on the merits at this juncture, the defendants' position is that the Court's final determination should be reserved until the conclusion of discovery and after further administrative determinations are made.

3. At the Court's request, defendants filed on December 8, an elaboration of certain representations made by defendants' counsel at oral argument. *See* Affidavit of Stanley Katz, Director, Division of Technical Policy of the Bureau of Health Insurance of the Social Security Administration. In sum, this document repre-

sents a commitment by defendants to afford plaintiff an administrative appeal of its liability designation in accordance with the provisions of 20 C.F.R. §§ 405.371(a) and 405.372, with the modification that the Bureau of Health Insurance, not the fiscal intermediary, will review the question. It is the Court's understanding that this review will be undertaken by personnel heretofore unconnected with this matter and will result in a detailed statement supporting the conclusions reached.

In the event that this determination is in whole or in part unfavorable to plaintiff, a formal intermediary hearing will be held pursuant to 20 C.F.R. §§ 405.1801 through 405.1833 for the purpose of allowing plaintiff to appeal all determinations concerning the amounts of the alleged overpayments. It is the Court's understanding that there would be no modification of this procedure and that a written decision would be issued pursuant to 20 C.F.R. § 405.1831.

4. *See* notes 24–27 *infra* and accompanying text.

government for the "reasonable cost" of such services as determined pursuant to pertinent implementing regulations. 42 U.S.C. §§ 1395f(b) and 1395x(v); *see* 20 C.F.R. §§ 401 *et seq.* To obtain reimbursement as a "provider" of such services, an institution or corporation must enter into a "provider agreement" with the Secretary as directed by the Act. 42 U.S.C. §§ 1395cc and 1395f(a). Such reimbursements are made directly to certified providers from the Federal Hospital Insurance Trust Fund established specifically for that purpose. 42 U.S.C. §§ 1395i and 1395x(v).

The day-to-day administration of this portion of the Medicare program has been delegated by the Secretary to "fiscal intermediaries," usually private health insurance companies such as defendant Mutual of Omaha. The fiscal intermediary of the program at the time of the alleged overpayments was Blue Cross of Southern California. These intermediaries have responsibility for a wide variety of functions, including determination of the proper amount of program disbursement and the actual disbursement of funds. 42 U.S.C. § 1395h. In recognition of the cash flow needs of health care providers, Congress has required that periodic interim disbursements be made to providers by the fiscal intermediaries not less often than monthly. 42 U.S.C. § 1395g; *see* 20 C.F.R. § 405.402(b)(1). These payments are of necessity only approximations; they are made subject to subsequent exact determination of proper reimbursement amounts made by the fiscal intermediaries at the conclusion of each semi-annual accounting period. 42 U.S.C. § 1395g; 20 C.F.R. § 405.454(a), (f). If after auditing a provider's records according to "reasonable cost" criteria a fiscal intermediary determines that the provider has received an overpayment during an accounting period, the intermediary may suspend future reimbursements sufficient to recover the

amount of the determined overpayment. 20 C.F.R. § 405.370.

In the instant case, the defendants' plan to recoup from plaintiff certain determined overpayments which, for the most part,[5] antedated plaintiff's ownership of the nursing home facilities to which they were made. When a provider agreement covering these two facilities was first executed, they were owned and operated by, respectively, two limited partnerships. One facility, then known as Whitmar Nursing Complex East, was owned and operated by Estate Investments, Ltd., whose general partner was a California corporation (Vector Corp.) and whose limited partners were a group of individuals. The second facility, known as Whitmar Nursing Complex West was owned and operated by Intercommunity Investors, Ltd., a limited partnership composed of California corporation (D.B.N. & W.) as its general partner and a number of individuals as limited partners.

On April 30, 1969, the group of limited partners associated with the Whitmar West facility incorporated as Intercommunity Investors Ltd., Inc. On May 12, the group of limited partners associated with the Whitmar East facility incorporated as Whitmar Nursing Complex, Inc. On August 2, plaintiff executed respective stock transfer agreements with the shareholders of Intercommunity Investors Ltd., Inc. and D.B.N. & W. and with shareholders of Whitmar Nursing Complex, Inc. and Vector Corp., wherein it contracted to acquire all issued and outstanding stock in these corporations.[6] As one of the provisions of these virtually identical agreements, the shareholders (referred to by the parties to this litigation as the "former owners") expressly retained all liability for any Medicare overpayments made in connection with the two nursing homes prior to the date of stock transfer.[7] That acquisition took place

---

5. *See* note 13 *infra* and accompanying text.

6. *See* Complaint Exhibits # # 2 and 3.

7. Under sub-heading "(v) Liabilities," each document provides as follows:

. . . Shareholder agrees to save, indemnify and hold harmless Beverly from any liabilities not reflected in said [balance sheet] statements or incurred in the ordinary course of business through closing date. Such liabilities against which Beverly shall be held

on October 24, 1969, and plaintiff commenced to operate the two facilities.

On July 12, 1971, plaintiff received notification from Blue Cross of Southern California ("Blue Cross"), the fiscal intermediary then serving plaintiff's nursing home facilities, that its review and audit of the accounting periods ending November 30, 1967, November 30, 1968, and December 31, 1969 revealed overpayments totaling $59,483 in connection with the Whitmar West facility.[8] The next day, notification of similar alleged overpayments totaling $203,509 during comparable accounting periods in connection with Whitmar East was mailed to plaintiff.[9] Plaintiff then undertook to appeal these overpayment determinations, while at the same time insisting that the former owners would be liable for any overpayments which took place prior to plaintiff's acquisition of the facilities in October, 1969.[10]

During the ensuing months of 1971 and the early part of 1972, there occurred a series of meetings and communications between representatives of plaintiff, the former owners, Blue Cross, and ultimately the Secretary. Additionally, plaintiff submitted the agreements by which it had acquired the corporate interests of the former owners.[11] As a result of this process, and based in large part upon these submitted transfer documents, Blue Cross' legal counsel concluded that the former owners, not plaintiff, were liable for the overpayments.[12] On March 29, 1972, this conclusion was fully concurred with by the Secretary's Assistant Regional Attorney, whose only reservation concerned plaintiff's possible liability for those overpayments allocable to the approximately ten-week period between the date of acquisition and the end of the last controversial accounting period, in late 1969.[13] The record before the Court reflects no sustained attempt by either the Secretary or his intermediary to pursue this matter against plaintiff for more than three years after these conclusions were reached by the Secretary's agents. There is similarly no indication in the record that the former owners disputed their status as the properly liable parties at any time prior to or during this three-year period extending into mid-1975.

At some time during this period, after Blue Cross was apparently unsuccessful in its attempts to recover the overpayment amounts from the former owners, the matter was referred to the Bureau of Health Insurance ("BHI") of the Social Security Administration, the agency primarily responsible for administering the Medicare program for the Secretary. By letter dated August 1, 1975, BHI informed plaintiff for the first time that the former owners were contesting their liability. It requested that plaintiff once again submit any documents which might support the conclusion that the former owners were the properly liable parties.[14] By letter dated January 28, 1976, the Government Accounting Office

---

harmless shall include, but not be limited to, any liabilities to Medicare, Medi-Cal, Blue-Cross or any other health insurance plan, whether governmental or private, and whether presently known or unknown. With respect thereto it is agreed between the parties that if Corporation or Partnership incurs any liability to Medicare, that for the purpose of this paragraph said liability shall be readjusted to reflect any depreciation which Corporation and Partnership might have legally claimed in their Medicare reimbursement formula, but declined to do so.
*Id.* at 17–18.

**8.**  *See* Complaint Exhibit # 4.

**9.**  *See* Complaint Exhibit # 3.

**10.**  *See* Complaint Exhibit # 5.

**11.**  *See* notes 6–7 *supra* and accompanying text.

**12.**  *See* letter of February 29, 1972, Complaint Exhibit # 16.

**13.**  *See* letter of March 29, 1972, Complaint Exhibit # 17. Since the intermediary determined that overpayments were made during the accounting period ending December 31, 1969 and plaintiff had acquired the facilities on October 24, 1969, plaintiff's submitted transfer documents could not serve as a possible defense in connection with any portion of the alleged overpayment liability which could properly be allocated to that brief interim period.

**14.**  *See* Exhibit E to Defendants' Opposition Memorandum.

("GAO") informed plaintiff that the Secretary had reported for collection plaintiff's alleged indebtedness of $83,530.76 in connection with Whitmar West.[15] On February 2, GAO similarly informed plaintiff of its alleged outstanding indebtedness of $204,523.68 in connection with Whitmar East.[16] After defendant Mutual of Omaha notified plaintiff of its intention to suspend Medicare disbursements as of June 30, 1976,[17] plaintiff filed this action.

## MERITS OF THE MOTION

Plaintiff has advanced a number of arguments in support of its motion for preliminary injunctive relief.[18] First, it points to the twin stock acquisition agreements in which it attempted carefully to contract away the very liability here at issue. Although the Secretary was not a party to those agreements and despite the fact that no new provider agreement was immediately thereafter executed as required for any purported "change of ownership" under 20 C.F.R. § 405.626(c), the former owners' express retention of Medicare overpayment liability was apparently deemed determinative of this question by the Secretary's agents.[19] However, plaintiff does not ask this Court to enjoin the defendants' planned recoupment solely on the strength of these documents. Neither does it rely exclusively upon the fact that the Secretary's agents had initially concluded that plaintiff was not liable for the overpayments in question.

Rather, plaintiff points to the totality of the circumstances herein presented and asserts to the Court that on these facts the Secretary's planned suspension would constitute an unlawful abuse of the Secretary's discretion and would violate due process of law. The Court agrees.

It is clear from the record that between the time that plaintiff first learned of the intermediary's overpayment determination in July, 1971, and the time that the matter was seemingly resolved in its favor in early 1972, plaintiff participated in the only form of administrative appeal process then available to it.[20] Plaintiff was led to believe that the intermediary, acting for the Secretary, would come to a decision regarding plaintiff's disclaimer of liability and that such a decision would be a final one.[21] Nothing in the record indicates any reason why after receiving a favorable decision upon its submission of supportive documentation, plaintiff should not have reasonably viewed the issue of its liability as having been conclusively decided in its favor. That is not to say, however, that the conclusion drawn and concurred with by the Secretary's agents was necessarily a legally correct one or that it precluded the Secretary from reviewing and pursuing the matter at some future date. The Court simply holds that it would be an abuse of the Secretary's discretion and a violation of due process for the Secretary to suddenly recoup the al-

15. *See* Complaint Exhibit #22.

16. *See* Complaint Exhibit #23. There is no explanation in the record of the discrepancy between the figures mentioned in these communications and the original overpayment amounts contained in the notices received by plaintiff four years earlier. *See* notes 8–9 *supra* and accompanying text.

17. *See* Complaint Exhibit #24.

18. Plaintiff has raised three additional issues which the Court does not reach at this juncture. First, it argues that the Secretary's planned suspension would abrogate the statutory provisions contained in 42 U.S.C. § 1395gg, a position which would appear undermined, not supported, by the cited authority of *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger*, 517 F.2d 329, 336, 340–41 (5th Cir. 1975). Second, it argues that the adminis-

trative recoupment procedure here at issue should be deemed to fall within the general statute of limitations contained in 28 U.S.C. § 2415, despite the fact that Congress there spoke only of the filing of a civil "complaint." Lastly, plaintiff makes the argument that its liability was somehow cut off by the incorporation procedures undertaken immediately prior to its stock acquisition.

19. *See* notes 12–13 *supra* and accompanying text.

20. *See generally Coral Gables Convalescent Home, Inc. v. Richardson*, 340 F.Supp. 646, 649 (S.D. Fla. 1972).

21. *See* Affidavit of Robert W. Pommerville at ¶¶ 23, 25, 27–30, and 37.

leged overpayments after the passage of over three years and without any accommodation to whatever equities might have accrued to plaintiff's position during that span of time.

Plaintiff points out, for example, the fact that the informal administrative appeal procedures which ironically operated to its favor in early 1972 were subsequently found to be constitutionally defective in *Coral Gables Convalescent Home, Inc. v. Richardson,* 340 F.Supp. 646 (S.D. Fla. 1972). In that case, which involved a recoupment procedure identical to the one at bar, the Court held that the Secretary's "failure to afford plaintiff at least a post-reduction hearing constituted a denial of due process." *Id.* at 650. Not long after that decision, the Secretary promulgated new regulations instituting certain formal post-suspension review procedures, effective May 27, 1972.[22] These procedures were in turn then severely criticized in *St. Jude Nursing Home, Inc. v. Richardson,* Civil No. 72–686 (M.D. Fla., Oct. 3, 1972), as "not designed to afford a meaningful administrative determination of provider payment disputes." *Id.* at 4; *see Americana Nursing Centers, Inc. v. Weinberger,* 387 F.Supp. 1116, 1119 (S.D. Ill. 1975). Consequently, the Medicare Act itself was amended to include an entirely new appeal mechanism, the Provider Reimbursement Review Board ("PRRB"), which provides for a more timely and comprehensive appellate review hearing. 42 U.S.C. § 1395oo.[23]

Under present circumstances, however, plaintiff has no right to avail itself of these constitutionally mandated review mechanisms. When enacting the PRRB amendment to the Act, Congress made that procedure expressly inapplicable to overpayments during any accounting period ending prior to June 30, 1973.[24] Although the Sec-

retary then amended his regulations in 1974 to permit providers a new right to an intermediary appeal for accounting periods ending prior to June 30, 1973,[25] it appears that plaintiff is precluded from that remedy as well: the amended regulations, at 20 C.F.R. § 405.1811, require that this appeal must be made within 180 days after the provider receives its "notice of amount of program reimbursement." As defined elsewhere in the Secretary's regulations,[26] this notice date would appear to be fixed in plaintiff's case as the dates at which it received its original overpayment notices in July, 1971.[27]

It is therefore not surprising that plaintiff contends that since it may not of right avail itself of the Secretary's existing appeal mechanisms, any sudden and seemingly arbitrary reversal of the outcome of the only administrative mechanism available as of 1971–1972 would deny it due process of law. The Court agrees that the Secretary's handling of this matter has indeed placed plaintiff at a most unfair disadvantage. Plaintiff purported to contract away the liability here in question; it participated in the only administrative procedure then in existence in an effort to disclaim that liability when first asserted; it received a favorable determination at the conclusion of that process; for over three years it was led to believe that the matter was settled and with no apparent evidence that the former owners were contesting their liability; and it presently faces a "Catch-22" type of administrative dilemma in which it cannot benefit from the Secretary's new, judicially-prompted appeal procedures partly because it has been distinctly disadvantaged by the Secretary's dilatory conduct. In its present posture, this case is therefore not so very different from those cases which have held the Secretary's recoupment procedures to

---

**22.** *See* 37 Fed. Reg. 10723 (May 27, 1972). These regulations were codified at 20 C.F.R. §§ 405.370 through 405.373 and at §§ 405.490 through 405.499. The latter set of regulations was subsequently amended and redesignated as 20 C.F.R. §§ 405.1801 through 405.1833. *See* 39 Fed. Reg. 34515 (Sept. 26, 1974).

**23.** *See* 20 C.F.R. §§ 405.1835 through 405.1877.

**24.** *See* Section 243(a) of Pub. L. No. 92–603 (October 30, 1972).

**25.** *See* note 22 *supra.*

**26.** *See* 20 C.F.R. § 405.1803(a).

**27.** *See* notes 8–9 *supra* and accompanying text.

be violative of due process of law. *See Americana Nursing Centers, Inc. v. Weinberger,* 387 F.Supp. 1116, 1119 (S.D. Ill. 1975), *citing St. Jude Manor Nursing Home, Inc. v. Richardson,* Civil No. 72–686 (M.D. Fla. Oct. 3, 1972); *Coral Gables Convalescent Home, Inc. v. Richardson,* 340 F.Supp. 646, 650 (S.D.Fla.1972); *cf. Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger,* 517 F.2d 329, 341 (5th Cir. 1975); *Columbia Heights Nursing Home and Hospital, Inc. v. Weinberger,* 380 F.Supp. 1066, 1072 (M.D. La. 1974). The Court accordingly holds that the defendants' planned suspension would violate plaintiff's constitutional right to due process of law.

Defendants argue that plaintiff fails to make a sufficient showing of irreparable injury,[28] inasmuch as any wrongful harm suffered by plaintiff as a result of the Secretary's planned recoupment would assertedly be directly compensable by mere money damages. *See, e.g., Graham v. Triangle Publications, Inc.,* 344 F.2d 775, 776 (3d Cir. 1965). The Court finds, however, that plaintiff would in fact be irreparably harmed if the Secretary were allowed to proceed with its suspension at this juncture. Even aside from the fact that this Court has found plaintiff's constitutional right to due process of law to be threatened by defendants' planned actions,[29] it is clear that plaintiff's ability to render effective medical services to those in need would be significantly hampered by the suspension of regular payments to which plaintiff would otherwise be entitled. No better indication of a provider's specific need for regular Medicare reimbursements could be found than that which is reflected in the statutory and regulatory scheme. Congress has purposely required that the providers of health care services be reimbursed by the Secretary "not less often than monthly." 42 U.S.C. § 1395g. Accordingly, the regulations promulgated by the Secretary to implement this requirement go to great lengths to ensure that "institutions shall not be disadvantaged, as they sometimes are under other arrangements . . . ." 20 C.F.R. § 405.402(b)(1); *see* 20 C.F.R. § 405.454. Thus, both Congress and the Secretary have recognized the potential harm involved here and the compelling public interest in providing timely and uninterrupted health care funding.

Plaintiff is therefore entitled to a preliminary injunction preventing the defendants from suspending its regular Medicare disbursements until after defendants have voluntarily afforded plaintiff further administrative recourse and until such time as this Court has made a final determination as to the merits of plaintiff's claim.

---

**28.** The criteria for determining the propriety of preliminary injunctive relief are set forth in *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission,* 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958).

**29.** The deprivation of a constitutional right has been properly held to be sufficient injury for the granting of preliminary injunctive relief. *See, e.g., Green v. Kennedy,* 309 F.Supp. 1127 (D.D.C. 1970).